IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

MATTHEW J. RUDD,

        Plaintiff,

v.                                            Civil Action No. 3:04-CV-39

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,
             Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I.  Introduction

A.    Background

      *Pro se* Plaintiff, Matthew Rudd, (Claimant), filed his Complaint on May 12, 2004, seeking

Judicial review pursuant to 42 U.S.C. § 405(g) of an adverse decision by Defendant, Commissioner

of Social Security, (Commissioner).[1]  Commissioner filed her Answer on July 16, 2004.[2]  Claimant

filed his Motion for Summary Judgment on March 21, 2005 and subsequently on April 1, 2005.[3]

Commissioner filed her Motion for Summary Judgment on May 12, 1005.[4]

B.    The Pleadings

        1.    Claimant's Motions for Summary Judgment.

        2.    Commissioner's Motion for Summary Judgment.

C.    Recommendation

---

[1] Docket No. 1.

[2] Docket No. 3.

[3] Docket Nos. 6 and 7.

[4] Docket No. 8.

1.     I recommend that Claimant's Motion for Summary Judgment be DENIED and that Commissioner's Motion for Summary Judgment be GRANTED because the ALJ was substantially justified in his decision.  Specifically, the ALJ properly assessed the opinion of Claimant's treating psychiatrist.  Also, a physician's assistant is not an acceptable medical source.  In addition, nothing in the medical record shows that Sacred Heart wanted to commit Claimant for two weeks with an option of forever.  Also, whether an individual is disabled is an issue reserved for the Commissioner.  In addition, the record does not support the proposition that Claimant has 5 to 10 bad days a month.  Also, Julie Jacobs is a supervised psychologist and not a monitoring assistant.  Lastly, a significant number of jobs exist in the national economy that Claimant could perform.

## II.  Facts

A.     Procedural History

On June 16, 1999 Claimant filed his first application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) payments.  The application was denied initially on September 22, 1999 and no further review was requested by the Claimant.

On July 3, 2001 Claimant filed for his second application for DIB and SSI payments alleging disability since January 3, 2001.  The application was denied initially and on reconsideration.  A hearing was held on March 4, 2003 before an Administrative Law Judge (ALJ).  The ALJ's decision dated April 14, 2003 denied the claim finding Claimant not disabled within the meaning of the Act.  The Appeals Council denied Claimant's request for review of the ALJ's decision on March 12, 2004.  This action was filed and proceeded as set forth above.

B.     Personal History

Claimant was 42 years old on the date of the March 4, 2003 hearing before the ALJ. Claimant has a high school education and some college and past relevant work experience as a mechanic and laborer.

C.    Medical History

The following medical history is relevant to the time period during which the ALJ concluded that Claimant was not under a disability January 3, 2001 - April 14, 2003:

1.  Medical Records

Tr. p. 129, April 16, 1998, Physical Examination
•         Medication currently in use: Carbamazepine.  Patient recently diagnosed as manic depression in treatment.  Still some depression.  Weekly psychotherapy session.

**Ryan J. Mcnermey, O.D.**
Tr. p. 130, Eye Examination Report, February 1, 2001
•         Near vision blurry at work, headaches.
•         Diagnosis: Low myopia, presbyopia.
•         Recommendations: Bifocals, tints.

Tr., pp. 134-135, Western Maryland Health System, Emergency Room Note, July 19, 2001
•         Patient told me that he was to be treated as an out-patient.  I spoke with the crisis counselor who states that was the original plan, but the patient made the statement to Dr. Lin that he was having rages which are uncontrollable and he was afraid that he was going to hurt someone and indeed he told the counselor that he had been banging his head against the wall trying to keep from hurting his mother.  I agree that this patient does have a mental health condition and is a potential danger to others and I will sign the certification form as requested.

Tr. pp. 136-138 , Western Maryland Health System, Emergency Room Note, July 19, 2001
•         Chief Complaint: Psychotic behavior.  This is a male with a history of bipolar disorder.  He has been off his medication for a year and a half because he said he wanted to find work.  Patient recently quit his job and said he almost had a psychotic break last week.  He said it happened on the road and he was lucky he had a seatbelt on because he was ready to hurt somebody.  Patient has been on medication before but said he had problems with Lithium.  He said he is in the emergency room because he thinks he needs to get back on his medication or else he is going to have another psychotic break and someone will get hurt.
•         History of significant manic depressive disorder and bipolar disorder: Patient smokes.  Patient will be admitted involuntarily because he refused to be admitted voluntarily.  Initially, patient agreed to be admitted, if necessary, to control his bipolar disorder.

<u>Tr., pp. 146-149, Michael E. Ehlers, M.D., Western Maryland Health System, Discharge
Summary, July 20, 2001</u>

•        Patient is a 40 year old male who was sent to the emergency room by a counselor
at the Potomac Highlands Guild.

•        Past Surgical History: Patient was at the Allegheny Mental Health Clinic from
1997 to 1999.  Patient was in therapy as a child in Warren, Ohio.  Patient once held a loaded gun
to his head contemplating suicide when he was younger.  Family history of alcoholism and
bipolar disorder in his father.

•        Past Medical History: Broken back causing motoric problems.  He has had
recurrent perirectal infections.  Patient says he was diagnosed with multiple sclerosis back in
1990 causing limb and vision problems.  Patient has a history of high blood pressure.  His blood
pressure was 160/110.  He has had surgery for rectal infections, tonsils and adenoids and has an
abscessed tooth.  Patient smokes a pack and a half of cigarettes a day.

•        Diagnosis: Bipolar by history; post traumatic stress disorder by history;
alcohol abuse by history in remission; history of fracture of the spine; recurrent perirectal
infections; history of multiple sclerosis; GAF 45, highest in the past year was 70.

<u>Tr., pp. 167-170, August 13, 2001, Patient Care Inquiry, DMHS Assessment</u>

•        Patient has not consumed alcohol in the past several years.  Over the past few
weeks, patient has felt very easily agitated and feeling like he could actually hurt someone.
About a week ago, he had road rage.  He pulled his car over and started to get out of the car to
beat the other man up but couldn't remember how to loosen his seat belt.  Patient has held a
loaded gun and contemplated holding it in his mouth and shooting himself in the past.  Patient
reports recent thoughts of hurting others.  Several days ago, patient banged his head on the wall
hard enough to leave a mark in an attempt to keep himself from hurting others.  Patient states
that when he inflicts pain on himself, it usually diverts him enough to stop the impulse, getting
more difficult to keep control.  He has erratic sleep patterns.

<u>Tr., pp. 176-177, Sacred Heart Hospital Psychiatric Nursing Assessment, July 19, 2001</u>

•        Patient states that he has erratic sleep patterns.  Patient states that his father was
physically, verbally and mentally abusive towards him as a child.

<u>Tr. pp. 208-209, Hampshire Memorial Hospital, Dr. Vijay K. Chowdhary, August 3, 2001</u>

•        Patient's First Visit. 40 year old white male.

•        Impression: History of mental problems by history.  Attention deficit, hyperactivity
         disorder, bipolar disorder, tobacco dependence, mild chronic obstructive pulmonary
         disease, possibly chronic low back changes on x-ray.

D.        <u>Testimonial Evidence</u>

<u>1. Claimant</u>

Testimony was taken at the hearing from Claimant, who testified as follows (Tr. 317-22):

Q        Now, do you believe you can work?

A        No.

Q        And why not?

A        Well, the bipolar is getting worse as I get older, and the meds I'm on do have negative effects. I - - you know, I'm doped. It's hard enough a job to do straight and sober.

Q        What meds - - medications are you taking?

A        Tegretol and Risperdal.

Q        And what time of the day do you take those medications?

A        I take Tegretol in the morning and Tegretol and Risperdal in the evening.

Q        And what are they for?

A        The Tegretol is an anti-manic. The Risperdal is an anti-psychotic.

Q        Any side effects?

A        Yeah, I'm, I'm dopey. When I'm up on my manic phase, I can pretty well function, but when I'm down and don't have all that energy to burn, I mean, I've been known to sleep 20 hours a day. I can't even pay attention to a TV, because the plot - -

Q        Which medication does that to you?

A        The Tegretol does it primarily. I think they've got me on real low dose of Risperdal, because it's so harsh. But yeah, it, it hit me as soon as they put me on the Tegretol, because there's not a lot of meds they can give bipolar people.

Q        Now, you indicated that you don't believe you can work because of the medications?

A        And, like I said, the older I get, the worse the bipolar gets. I still go up and down

5

even with the meds.  I just don't end up punching a wall anymore or banging my head into it.

Q        Any problems being around people?

A        Yes.  That's why they put me on Risperdal.  Crowds tend to aggravate me.  I get really wired.

Q        Do you have any concentration problem?

A        Yes.

Q        What kind of concentration problem do you have?

A        Well, like I said, it depends on whether I'm having a good day or a bad day.  On the bad days. I can't follow a TV show.  It's, you know, it's that heavy.  But on good days, like I said, I'm functional.  I just don't know if any job would let you have, you know, two bad days a week.  (INAUDIBLE).

*          *          *

Q        Okay.  And was there violence in those jobs?

A        Not physical, but I would - - that job for Mel's Tire, I got into it with the foreman, a couple times screaming battles and throwing stuff around, and he was throwing stuff back at me, so - -

Q        So there were at least three of the mechanic jobs that you were fired from?

A        Yes.

Q        Were there any that you, that you actually quit because you were having problems on the job?

A        The mechanic jobs, no.

Q        Or any of the jobs.

A        Yes, like I said, the, the cell phone, I quit because I was having problems with the foreman. Super (INAUDIBLE) - - the one where I got the chemical burns, I was having problems with the foreman because I was getting more and more aggravated. I couldn't deal with it, and he couldn't deal with me. It was based around chemicals, but I quit because I couldn't get through to the foreman without getting - - I quit rather than beat him up.

Q        How well do you interact with other people?

A        I can - - good day/bad day. On a bad day, I couldn't walk into a Wal-Mart because I had to go back outside because the crowds got to me. I don't socialize. The only real friends I got are the ones I made in high school, because I don't socialize well with people.

Q        Okay. You've been diagnosed with multiple sclerosis?

A        Yes.

Q        Does that have any affect on your ability to work?

A        Yes, it's, it's left residual damage in my one eye. My one eye doesn't focus as well as the other one. That's part of the reason I was - - tinted glasses from the doctor.

Q        How about your strength and endurance?

A        Well, I don't know whether it's the MS - - well, probably some of it, yeah, it does leave me weak, and I get a little tired easily. but that's also because of the other thing.

ALJ        Let me interrupt. I want to go back to the eye problem. What problem as far as limitations - -

CLMT        Well, like I said - -

ALJ        - - are you experiencing from your eye?

CLMT        - - it's - - the one eye doesn't focus as quick as the other one, so I get

glare.  I get these killer migraines from the eye stress, and that was - - that's the reason they used to fire me from the last job.  Because even though I had a doctors prescription for tinted glasses, they said it violated safety protocol.

BY LEGAL REPRESENTATIVE:

Q    How frequently do you get the migraines?

A    It's a glare thing.  It's high light.  So it depends on what I'm doing, but in the high glare, if you add that factor, it was a couple, three times a week, I'd get killer migraines.

Q    Okay, do TV screens do the same thing to you?

A    Yes.

Q    (INAUDIBLE).  Do you take anything for that?

A    No, it's mechanically in the eye.  It's just focusing quick as the other.

Q    So you just try to avoid that?

A    Avoid the situation.

*                *                *

Q    So to the point that you've described to the judge the side effects - - you still, still have anger problems.  You have fears of crowds.  You also had a diagnosis of PTSD.  Did that stem from a childhood problem?

A    Yes, my father was an abusive alcoholic.  I got beat around pretty good, especially (INAUDIBLE).

Q    Okay, do you have any residuals from that?

A    Well, there's plaque on my brain, but they're not sure where it came from, you know, repeated blows they said could have done it.  When they were checking me for the MS

they found plaque in the brain.

Q        Okay, do you have any problems about that?

A        I've pretty much blocked my childhood. I don't have flashbacks like standard. I just - - you put me in a confrontation situation, I tend to lose control.

Q        Do you think that has something to do with the authority figures that - -

A        A couple doctors have said that, yes.

*        *        *

## 2. Vocational Expert

Testimony was taken at the hearing from Vocational Expert, who testified as follows (Tr. 323-25):

Q        Assume we have a person of the claimant's same age, education, and work history. Also assume this person can perform the exertional level of medium work as defined in the Commissioner's regulations. However, the individual should avoid work around dangerous and moving machinery or unprotected heights. The individual should also avoid work in an environment that has light with a high glare, sort of a bright atmosphere. The individual also has a moderate deficiency in social functioning and a moderate deficiency in concentration, persistence, and pace. (INAUDIBLE) person be limited to performing simple, unskilled tasks involving no more than minimal contact with the public. Are there jobs such a person could do?

A        Yes, sir.

Q        Please - -

A        At the - -

Q        Please - -

A       - - medium unskilled level we have assemblers such as for wet wash.  There are 14,000 nationally, over 250 locally.  We have kitchen helper.  There are over 79,000 nationally, over 2,500 locally.  And we have floor waxer.  There are over 26,000 nationally, over 250 locally.

Q       Hypothetical number 2 will be the same as one except I'm going to also include someone (INAUDIBLE) in contact with coworkers and supervisors.  Would that have an effect on the jobs or numbers that you named?

A       It would likely reduce the number of the jobs given in half.

Q       Hypothetical number 3 would be the same as 2, except the person is limited to performing no more than light exertional work as defined in the Commissioner's regulations.  Are there light jobs such a person could do?

A       Yes, sir.

Q       Please identify the jobs.

A       Assembler 2, such as (INAUDIBLE), and the global numbers that I give you will be reduced by the 50%, since I reduced it in number 2.  Okay?  All right, so the national numbers are over 76,000 nationally, about 500 locally.  We have bagger, and that would be dry cleaning, not grocery store.  There are 40,000 nationally, 350 locally.  And pre-assembler with simple circuit boards.  There are 50,000 nationally, over 300 locally.

ALJ          Hypothetical number 4, assume that the testimony given by the claimant is supported by the record - - that is that he has, you know, these two out of five days a workweek that he would have bad days, and would essentially be incapacitated (INUADIBLE) most of those - - (INAUDIBLE) on those typical bad days, could he perform jobs you've identified

(INAUDIBLE)?

A       That individual would be able to perform no work.

\*                    \*                    \*

E.       Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

•       Smokes a pack and a half of cigarettes per day. (Tr. 147).

•       History of alcohol abuse. (Tr. 148).

### III.  The Motions for Summary Judgment

A.       Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that the ALJ erred when he ignored the opinion of Claimant's treating psychiatrist, Dr. Raines. Also, Claimant contends that the ALJ failed to consider Dr. Cerami's opinion that Claimant is not employable. In addition, Claimant maintains that Sacred Heart Hospital wanted to commit Claimant for two weeks with an option of forever. Also, Claimant cites Dr. Hoover's opinion that Claimant is completely disabled. In addition, Claimant argues that the Vocation Expert's (VE) testimony supports the finding that Claimant cannot work. Also, Claimant contends that Julie Jacobs is a monitoring assistant whose opinion should not be relied upon. Lastly, Claimant argues that the only two position provided by the VE do not accommodate Claimant's Residual Functional Capacity (RFC).

Commissioner maintains that the ALJ's decision was supported by substantial evidence.

Specifically, Commissioner contends that the ALJ properly assessed the opinion of Claimant's treating psychiatrist. Also, Commissioner maintains that Arthur Cerami, Jr. is not a doctor but a physician's assistant and therefore not an acceptable medical source. In addition, Commissioner points out that nothing in the medical record shows that Sacred Heart wanted to commit Claimant for two weeks with an option of forever. Also, Commissioner points out that whether a Claimant is disabled is an issue left to the ALJ. In addition, Commissioner maintains that the record does not support the proposition that Claimant has 5 to 10 bad days a month. Also, Commissioner points out that Julie Jacobs is a supervised psychologist and not a monitoring assistant. Lastly, Commissioner maintains that a significant number of jobs exist in the national economy that Claimant could perform

B.    The Standards.

1.    Summary Judgment.    Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.    Judicial Review.    Only a final determination of the Commissioner may receive

judicial review.  See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.      Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.      Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.      Disability Prior to Expiration of Insured Status- Burden.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(i), 423(c); Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6.      Social Security - Standard of Review.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  Hayes v.  Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.  Social Security - Scope of Review - Weight Given to Relevant Evidence.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry."  Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are

unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

8.    Social Security - Substantial Evidence - Defined. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.    Social Security - Sequential Analysis. To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

10.    Social Security - Treating Physician - Controlling Weight - The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 416.927(d)(2). See also Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984); Heckler v. Campbell, 461 U.S. 458, 461 (1983); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990).

11. Social Security - Ultimate Issue. Whether an individual is disabled or able to work is an

14

issue reserved for the Commissioner. SSR 96-5p. Opinions as to disability or ability to work given by a treating source can "never be entitled to controlling weight or given special significance." Id.

12. Social Security - Physician's Assistance. A Physician's assistant is not an acceptable medical source. 20 C.F.R. §§ 404.1513, 416.913 (2004). The Opinion of a physician's assistant may be used to show the severity of an impairment and how it affects the ability to work. Id.

C.    Discussion

1.  Treating Psychiatrist

Claimant asserts that the ALJ erred when he ignored the opinion of Claimant's treating psychiatrist Dr. Raines. Commissioner counters that Dr. Raines' opinion is not consistent with other substantial evidence.

The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. § 416.927(d)(2). See also Evans v. Heckler, 734 F.2d 1012 (4th Cir. 1984); Heckler v. Campbell, 461 U.S. 458, 461 (1983); Throckmorton v. U.S. Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990).

On December 4, 2002, Dr. Raines opined that Claimant's incapacity/disability is expected to last indefinitely. (Tr. 289). Whether an individual is disabled or able to work is an issue reserved for the Commissioner. SSR 96-5p. Opinions as to disability or ability to work given by a treating source can "never be entitled to controlling weight or given special significance." Id. The ALJ correctly ruled that while Dr. Raines' opinion as to disability is "part of the record and must be considered, [it] is not entitled to controlling weight or special significance." (Tr. 20).

On September 12, 2001 Dr. Raines noted that Claimant was doing okay on Tegretol and experiencing only mild drowsiness. (Tr. 18, 239). Also, Dr. Raines noted that Claimant had much less anger, better control and that he slept okay. (Tr.18, 239). Dr. Raines assessed Claimant with bipolar disorder in remission. (Tr. 18, 239). On July 17, 2002 Claimant's affect and mood were normal, Claimant's speech was mildly over-productive and Dr. Raines assessed Claimant with bipolar disorder in remission and possible multiple sclerosis. (Tr. 290). On December 4, 2002, Dr. Raines assessed Claimant with bipolar disorder in remission. (Tr. 289). The ALJ "gave significant weight to the reports of claimant's treating physician (Dr. Raines)." (Tr. 20). Therefore, the ALJ properly assessed the opinion of Claimant's treating psychiatrist.

## 2. Physician's Assistant

Claimant cites Dr. Cerami Jr.'s opinion that Claimant is not employable and that the only way Dr. Cerami Jr. could approve Claimant for employment would be if a psychiatrist deemed Claimant suitable for work. Commissioner counters that Arthur Cerami Jr. is not a doctor and is a physician's assistant which is not an acceptable medical source and the ALJ is not required to afford him any particular deference.

A Physician's assistant is not an acceptable medical source. 20 C.F.R. §§ 404.1513, 416.913 (2004). The Opinion of a physician's assistant may be used to show the severity of an impairment and how it affects the ability to work. Id.

Arthur J. Cerami Jr. is a physician's assistant and not a physician and is therefore not an acceptable medical source. Regardless, Mr. Cerami Jr.'s opinion just stated that Claimant is physically ok and that in order to fully evaluate disability status Mr. Cerami Jr. recommends a psychiatric recommendation.

### 3.  Commitment records

Claimant cites his forced commitment records from Sacred Heart Hospital where he was going to be committed for two weeks with an option of forever in long term care.  Commissioner counters that Claimant sought to voluntarily admit himself but was subsequently admitted on the basis of his own statements and was discharged after one night's evaluation and found to be not a danger.

On July 19, 2002 Claimant wanted to be treated as an outpatient at Sacred Heart Hospital. (Tr. 135).  After Claimant made statements to "Dr. Lin that he was having rages which were uncontrollable and he was afraid that he was going to hurt someone and indeed told the counselor that he had been banging his head against the wall trying to keep from hurting his mother" Claimant was involuntarily admitted.  Upon a mental status exam Claimant was "an alert man with a stable level of consciousness and no acute distress . . . he was well related . . . [t]here were no psychomotor abnormalities.  Speech was normal rate, tone and fluency.  Thought process was logical and goal directed.  There were no hallucinations or paranoia."  (Tr. 147).  Claimant stayed overnight and was released the next day.  (Tr. 148).  Claimant was found to be "not an acute danger to self or others."  (Tr. 148).  Nothing in the medical record supports that Sacred Heart Hospital wanted to commit Claimant for two weeks with an option of forever.

### 4.  Dr. Hoover

Claimant asserts that the ALJ erred when he failed to adopt Dr. Hoover's opinion. Commissioner does not respond to this issue.

Dr. Hoover stated Claimant "suffers from manic depression which is very difficult to control and it takes an employer who is extremely compassionate and understanding in order to

work with people with this illness. Because of his significant phases of manic depression, I would suggest that he is completely disabled, particularly with the added problems of an old fracture with pain in his thoracic spine" (Tr. 236-37).

Dr. Chowdhary opined that Claimant can function independently with treatment. (Tr. 17, 206). Julie Jacobs a supervised psychologist and Thomas Stein a supervising psychologist noted that on Claimant's mental status exam he was oriented times four, Claimant's mood was good, his affect was appropriate, his insights was good, his judgment was average, memory was normal. (Tr. 18, 210-17).

Whether an individual is disabled or able to work is an issue reserved for the Commissioner. SSR 96-5p. Therefore, the ALJ did not err when he did not adopt Dr. Hoover's Opinion that Claimant is disabled.

### 5. VE Testimony

Claimant asserts that the VE testified that if Claimant has 5 to 10 bad days a month he would be unable to work. Commissioner counters that the record does not support that Claimant has 5 to 10 bad days a month.

Claimant cites Dr. Raines, the staff of Sacred Hearth, and Dr. Moore for the proposition that Claimant would be unable to work and that he is manic and depressed. It has already been discussed above that whether an individual is disabled or able to work is an issue reserved for the Commissioner. SSR 96-5p. Also, the record does not prove that Claimant has 5 to 10 bad days a month.

### 6. Julie Jacobs M.A.

Claimant asserts that the ALJ erred when he relied on an exam done by Julie Jacobs who

is neither a doctor or a therapist. Commissioner counters that Julie Jacobs is a supervised psychologist and her opinion was reviewed by Thomas C. Stein a supervising psychologist.

Claimant misinterpreted the M.A. after Julie Jacobs name to mean monitored assistant. Under her name it clearly states that Julie Jacobs is a supervised psychologist. (Tr. 217). Also, right under Ms. Jacobs' signature is the signature of Thomas C. Stein, Ed.D. her supervising psychologist.

Claimant maintains that Ms. Jacobs erred when she concluded that Clamant would not be able to handle a fiscal award in a manic episode because his manic episodes do not include the spend, gamble syndromes. Ms. Jacobs stated that "[i]n the event that fiscal awards are given, the claimant is deemed to be capable of handling his own financial affairs if he is maintaining his medication regiment and is not in a manic episode." (Tr. 217). This is a positive review for Claimant. The inference being that while Claimant is on his medication, he does not have manic episodes and is capable of handling his own financial affairs.

### 7. Available jobs

Claimant maintains that the only two positions provided by the VE do not accommodate Claimant's residual functional capacity (RFC). Commissioner counters that the positions offered by the VE satisfy Claimant's RFC.

Claimant cites floor waxer as one of the positions cited by the VE. However, floor waxer was cited by the VE for someone performing medium unskilled level work. The ALJ found Claimant to have the RFC to perform less than a full range of light level work with the limitations of avoiding "working around dangerous machinery or unprotected heights, avoid working a high light glare environment; and due to moderate deficiencies in social functioning and in

19

concentration, persistence or pace, he is limited to performing simple, routine, unskilled tasks involving no more than minimal contact with the public, co-workers or supervisors." (Tr. 23). The VE testified that someone with Claimant's RFC could be an assembler for wet wash, a bagger for a dry cleaning, and a pre-assembler with simple circuit boards. Even if the job of bagging for a dry cleaning violated Claimant's RFC because it involved working around presses and conveyor systems there are still the jobs of assembler for wet wash and pre-assembler with simple circuit boards. Therefore, a significant number of jobs exist in the national economy that Claimant could perform.

## IV. Recommendation

For the foregoing reasons, I recommend that Claimant's Motion for Summary Judgment be DENIED and that Commissioner's Motion for Summary Judgment be GRANTED because the ALJ was substantially justified in his decision. Specifically, the ALJ properly assessed the opinion of Claimant's treating psychiatrist. Also, a physician's assistant is not an acceptable medical source. In addition, nothing in the medical record shows that Sacred Heart wanted to commit Claimant for two weeks with an option of forever. Also, whether an individual is disabled is an issue reserved for the Commissioner. In addition, the record does not support the proposition that Claimant has 5 to 10 bad days a month. Also, Julie Jacobs is a supervised psychologist and not a monitoring assistant. Lastly, a significant number of jobs exist in the national economy that Claimant could perform.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to

which objection is made, and the basis for such objection.   A copy of such objections should be submitt3ed to the District Court Judge of Record.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to parties who appear *pro se* and any counsel of record, as applicable.

DATED: June 21, 2005

/s/ James E. Seibert

JAMES E.  SEIBERT

UNITED STATES MAGISTRATE JUDGE